47 So.3d 541 (2010)
STATE of Louisiana, Appellee
v.
Michael Bradford BASS, Appellant.
No. 45,298-KA.
Court of Appeal of Louisiana, Second Circuit.
August 11, 2010.
Rehearing Denied September 16, 2010.
*542 Burnes, Burnes & Talley by Dmitrc I. Burnes, Christian & Byars by James E. Christian, for Appellant.
Michael Bradford Bass, Pro se.
Jerry L. Jones, District Attorney, Ellen R. Eade, Assistant District Attorney, for Appellee.
Before STEWART, CARAWAY and PEATROSS, JJ.
STEWART, J.
The defendant, Michael Bradford Bass, pled guilty to attempted first degree murder. He was sentenced to 20 years at hard labor without benefits of parole, probation or suspension of sentence. The defendant now appeals. For the reasons discussed below, we affirm the defendant's conviction and sentence.

FACTS
On June 25, 2007, at approximately 5:00 p.m., officers with the Monroe Police Department responded to a multiple car accident that occurred at a busy intersection in Ouachita Parish. Corporal Doug Lambert, one of the responding officers, was investigating the driver of the vehicle who caused the initial collision, Ginny Ettredge. Based on his experience and training, he determined that Ettredge was driving under the influence, and placed her in his patrol car in order to direct his attention to the collision and resulting traffic jam.
Several bystanders informed Corporal Lambert that they had seen a man approach Ettredge's vehicle and take a black bag from the car. He then left in his red Mercedes convertible. Corporal Lambert noted the information but continued with his investigation because this person was no longer present. Shortly thereafter, the same individual returned in the red Mercedes convertible and signaled to Corporal Lambert. As Corporal Lambert approached *543 the red Mercedes, he realized that this man, who was later identified as Michael Bradford Bass, was the same man that removed the black bag from Ettredge's vehicle.
Corporal Lambert looked down and saw a black bag on the passenger seat of the man's car. As he went to grab the bag, Bass pulled the bag in the opposite direction, causing Corporal Lambert to fall into the car. Bass accelerated the vehicle, with Corporal Lambert still inside, whereupon a police chase ensued. The car ultimately came to a stop after crashing into a brick building. Bass was subsequently arrested and the black bag was taken into evidence.
On July 26, 2007, Michael Bradford Bass, the defendant, was charged by bill of indictment with the following four counts: (1) attempted first degree murder; (2) obstruction of justice; (3) possession of a Schedule II, Controlled Dangerous Substance (cocaine) with intent to distribute; and (4) possession of a Schedule I, Controlled Dangerous Substance.
On August 5, 2008, the trial court heard the defense's motions to quash and to suppress. At the hearing, the state called its first witness, Corporal Lambert. He testified that on June 25, 2007, at approximately 5:00 p.m., he responded to a traffic accident involving a city bus at a busy intersection in Ouachita Parish.
Corporal Lambert testified that as he approached one of the vehicles involved in the accident, a dark blue Saturn, he observed that the driver, Ginny Ettredge, appeared to be under the influence and lethargic. When Corporal Lambert began to inquire about her insurance, the defendant, Michael Bass, approached and began to answer his questions. Corporal Lambert identified the defendant in open court as the same individual who approached him on that date. Because it appeared that DUI charges might arise, Corporal Lambert placed Ettredge in the back of his patrol car for further questioning.
Several bystanders then motioned to Corporal Lambert to come over and talk to them. One bystander, Russell Galyean, told Corporal Lambert that the defendant disregarded Ettredge's well being and searched the car frantically. He then exited with a black bag, which he placed in a red car and drove away. Galyean identified the defendant by name, as he was a previous employee of the defendant.
At this point, Corporal Lambert believed that because the red car was gone, there was nothing he could do with this information. He testified that he went to investigate another vehicle that was involved in the collision and was approached again by one of the bystanders who reiterated the black bag story. Lambert started to return to the Saturn, but was interrupted when he saw the defendant parked in a red Mercedes convertible nearby. The car was parked with the engine running and the top down. When he observed the defendant in the red car, he explained his thought process:
Well, everything clicked. Because when... when the eyewitness ... used the name "Bass" had taken the bag, it ... you know, it all kind of came together. This was the same guy that I had talked to about the insurance information and the towing company. And it all dawned on me, this is the same guy. This is the guy that they're talking about.
At this point, Corporal Lambert testified that the defendant hollered something to the effect of "Hey, where's my girl?" Lambert approached the car on the passenger side to explain that Ettredge was in the back of the patrol car and to see if the black bag was visible in the defendant's car. Eventually, he was standing *544 right next to the red convertible, with his thigh touching the passenger side door.
Corporal Lambert testified that when he saw the black bag in the passenger seat, he reached down to grab it. The defendant jerked the bag in the opposite direction, and in doing so, pulled Lambert into the car, head first. Simultaneously, the defendant hit the gas pedal and accelerated the vehicle at a high rate of speed. Lambert repeatedly yelled at the defendant to stop the car, but to no avail. The defendant's only response Lambert's pleas to stop was that "he could not go back" (to jail presumably).
The defendant continued at a high rate of speed, swerving back and forth in an attempt to throw Corporal Lambert from the car. Lambert testified that he reached down to the floor shifter and jerked it down to a low gear, which resulted in the car still going forward but the tires moving at a slower rate. Although the car was in a low gear, the defendant continued to accelerate in spite of Lambert's pleas. When Lambert looked up, the defendant was accelerating directly toward a telephone pole which, had it been struck, would have impacted the passenger side where Lambert was located. Lambert was able to grab the steering wheel and veer the vehicle away from the telephone pole, whereupon the car spun around several times in the road.
Through the spinning, Corporal Lambert lost control of the wheel and following a brief pause, the defendant drove the Mercedes into a brick building at a high rate of speed. Lambert was thrown into the windshield as the car continued into the building. The defendant attempted to reverse the car out of the building. However, the defendant's getaway was thwarted when he crashed his car into a patrol car parked behind him.
Although in a contorted position, Corporal Lambert was able to unholster and deploy his Taser into the defendant's side. Following a brief struggle, the defendant was arrested and handcuffed. The defendant took the bag with him but Lambert told the officers to secure the bag. As a result of this ordeal, Lambert testified that he suffered a contusion to his lower leg bone and ankle bone. He also testified that he believed he was going to be killed.
On cross, Corporal Lambert explained why he reached for the black bag in the defendant's convertible:
Because in my opinion he had illegally removed the bag from what was a crime scene. I did not know if I would be able to get it back. I did not know even if I called a car and tried to have him stopped, if we would ever ... after that point if it would ... if we would be able to get control of it again.
...
I was afraid that whatever was in the bag was what she was on that had led her to ... to be in the condition that she was in to be driving. I didn't know if it was drugs for sure. It could have been a bottle of vodka. It could have been anything. I just didn't know. I just know he wasn't supposed to take it from the car.
Corporal Lambert testified that the area was considered a "crime scene" because it was apparent that Ms. Ettredge was driving under the influence. Because of how small the black bag was, when the defendant attempted to get the bag back from Corporal Lambert, he inadvertently or intentionally, grabbed part of the officer's hand.
Next, the state called Summer Nicole Neilsen, who lived at the Mary Lea Apartments, which faced the accident scene. After hearing the loud crash, Neilsen testified *545 that she went outside and observed the following:
I saw the red car ... the Mercedes pull in. And at the time I saw Mr. Bass get out of his car, after he had parked it at the apartment across from me, walk over to the blue vehicle and went to the passenger side, removed a black bag and came back to his car and went into ... and went inside the apartment and then came out a few seconds later and left.
Neilsen knew the defendant prior to the day of the accident and identified him in open court. She did not observe any law enforcement officers during the time that the defendant removed the bag and entered the apartment. According to her, the defendant arrived within seconds following the accident and the police arrived shortly after he entered the apartment. Neilsen observed Corporal Lambert approach the defendant in the red Mercedes and when the officer reached into the car, the defendant immediately drove off with the tires screeching and causing smoke.
The state's next witness was Russell Galyean, who also lived in the Mary Lea Apartments. Galyean arrived home soon after the accident occurred. Upon arriving at the complex, he walked to the street where the accident occurred. Galyean testified that he observed the defendant walk up to the blue Saturn and remove a black bag from the car. Galyean knew the defendant, because he had worked for him in the past, and he identified him in open court. The defendant was a car salesman and Galyean was hired as an employee at the defendant's business. Galyean was asked to leave after he failed to sell any cars. He testified that the circumstances surrounding his termination were "fine" and that he understood why he had been let go.
Galyean testified that he alerted Corporal Lambert to the defendant's removal of the black bag from the Saturn. Galyean later observed Corporal Lambert speaking to the defendant while he was in the red Mercedes. Thereafter, Lambert reached into the car and the defendant accelerated the vehicle causing the tires to screech and the car to take off with the officer on top. At this point, the state introduced into evidence the statement from Galyean which detailed the information he provided to Corporal Lambert on the date of the accident.
Next, the state called Corporal Reginald Brown with the Monroe Police Department. Corporal Brown responded to Corporal Lambert's request for assistance at the accident scene. Brown testified that he spoke with Ettredge, whose speech was slurred and that it was apparent she was under the influence. While speaking with Ettredge in the police car, Brown saw Lambert reach into the defendant's car for the black bag and the defendant "grab him and yank him in." Then, he could only see white smoke from the tires and Lambert partially inside the car as it sped away.
Corporal Brown followed the defendant in his patrol car whereupon he observed the Mercedes spin around several times before running into the building. At this point, Brown told the defendant to stop, but the defendant attempted to back the car out of the building. Brown identified the defendant in open court.
According to Corporal Brown, after he blocked the Mercedes with his patrol car, the defendant exited the vehicle and attempted to walk away. A struggle ensued and Brown was not able to subdue the defendant without assistance from other officers. Brown testified that he could not recall whether or not the defendant exited the vehicle with the black bag.
The state's next witness was Officer Scotty Sadler with the Monroe Police Department. *546 He testified that when he arrived, Corporal Brown had already placed the defendant in handcuffs. Sadler identified the defendant in open court. He testified that after the defendant was detained, he was told by Corporal Lambert to retrieve the black bag. Officer Sadler located the bag and secured it in the trunk of a patrol car. Prior to doing so, Officer Sadler opened the bag and, based on his experience and training, observed what he believed to be a large quantity of crack cocaine.
Officer Sadler was approached by Russell Galyean who claimed to have witnessed the event. Sadler gave Galyean a piece of paper and asked him to provide his statement. Galyean returned the paper with his sworn statement to Officer Sadler. On cross, Sadler testified that while at the hospital where the defendant was examined, the defendant asked the officer to "tell that cop I didn't mean to hurt him."
At the conclusion of the hearing, the defense asked the court to suppress any evidence from the black bag and alleged that the bag itself was illegally seized from the defendant. The defense further argued that any arrests therefrom should also be suppressed. The trial court denied the motion and found that Corporal Lambert had probable cause to believe that the bag was evidence of a crime and, thus, had probable cause to detain the bag. The court noted that the witnesses were not anonymous tipsters.
The defense also argued that the defendant's actions were reasonable, and that he had the right to resist an unlawful arrest. The court held that there was no unlawful arrest, but there was a detention of a bag that was evidence in two crimes (the possible DWI and obstruction of justice). The court provided that the officers had probable cause to arrest the defendant on numerous occasions for the following crimes: obstruction of justice, battery of a police officer, and attempted murder of a police officer. Finding that the initial seizure and subsequent search and seizure were lawful, the trial court denied both the motion to suppress and motion to quash.
On August 15, 2008, the defendant vacated his plea of not guilty and entered a plea of guilty to the charge of attempted first degree murder. The plea agreement provided that in exchange for his plea, the defendant would receive 20 years at hard labor without benefits and the state would drop the remaining charges. The defendant maintained his rights under Crosby regarding the rulings on the motions to quash and suppress. State v. Crosby, 338 So.2d 584 (La.1976).
Before explaining to the defendant the rights he was waiving, the trial judge began by requesting that the defendant ask for clarification at any point if he did not understand 100% of what was being discussed. The trial judge advised the defendant, and the defendant stated that he understood that he had a right to trial by jury and a right to confront witnesses; and by entering the guilty plea, he was waiving those rights. The judge explained these rights in detail and the defendant said that he fully understood what he was giving up.
The trial judge explained the elements of the crime of first degree murder. The defendant inquired as to the difference between first and second degree murder. During the explanation, the defendant stated that he understood first degree murder to be "premeditated." The judge laid out all of the factors that elevate a homicide to first degree murder under Louisiana law. Following the discussion, the defendant stated that he understood the difference. Again, the defendant asked for clarification regarding the *547 judge's choice of words. And again, the judge clarified and the defendant stated that he understood. Following an adequate plea colloquy, the trial court accepted the defendant's plea of guilty for the crime of attempted first degree murder.
The defendant was convicted of attempted first degree murder of a police officer and was sentenced to 20 years at hard labor without benefit of probation, parole or suspension of sentence. This appeal followed.
The defendant filed a pro se brief alleging the following assignments of error: 1) that the rulings on the motions to suppress and quash were erroneous; 2) that he was denied effective assistance of counsel; and 3) that Russell Galyean's handwritten statement was never produced, thus denying his right to appeal on a complete record. Additionally, appellate counsel filed a brief on behalf of the defendant alleging three assignments of error: 1) the trial court erred in denying the motion to quash; 2) the trial court erred in denying the motion to suppress; and 3) the trial court erred in accepting the guilty plea.

LAW AND DISCUSSION

Motion to Quash and Motion to Suppress
In the defendant's first assignment of error, he urges that the trial court erred in denying the motion to quash and the motion to suppress, and in relying on inconsistent and inadmissible hearsay statements. Similarly, the defendant's counsel contends that the evidence obtained should have been suppressed and further, the indictment quashed. More specifically, his counsel argues that warrantless searches are generally unreasonable and because exigent circumstances did not exist, the seizure of the bag was illegal. Thus, any evidence obtained therefrom is also illegal. For the sake of efficiency, we will join these assignments together to discuss under one analysis.
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. State v. Crisp, 33, 165 (La.App. 2 Cir. 8/31/00), 767 So.2d 163; Rosell v. ESCO, 549 So.2d 840 (La.1989). In order to reverse a factfinder's determinations, a two-part test must be satisfied: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120 (La.1987).
State v. Gipson, 45,121 (La.App.2d Cir.4/14/10), 34 So.3d 1090, provides the legal principles relevant to warrantless searches and motions to suppress that arise therefrom:
The right of every person to be secure in his person, house, papers, and effects against unreasonable searches and seizures is guaranteed by the Fourth Amendment to the United States Constitution and Article I, § 5 of the 1974 Louisiana Constitution. It is well settled that a search and seizure conducted without a warrant issued on probable cause is per se unreasonable unless the warrantless search and seizure can be justified by one of the narrowly drawn exceptions to the warrant requirement. State v. Thompson, 2002-0333 (La.4/9/03), 842 So.2d 330; State v. Ledford, 40,318 (La.App.2d Cir. 10/28/05), 914 So.2d 1168; State v. O'Neal, 44,067 (La.App.2d Cir.4/8/09), 7 So.3d 182, writ denied, 2009-1243 (La.2/12/10), 27 So.3d 841.
The purpose of limiting warrantless searches to certain recognized exceptions is to preserve the constitutional *548 safeguards provided by a warrant, while accommodating the necessity of warrantless searches under special circumstances. State v. O'Neal, supra.

When the constitutionality of a warrantless search or seizure is placed at issue by a motion to suppress the evidence, the state bears the burden of proving that the search and seizure were justified pursuant to one of the exceptions to the warrant requirement. La. C. Cr. P. art. 703(D); State v. O'Neal, supra.

The plain view doctrine is an exception to the warrant requirement. State v. Young, 39,546 (La.App.2d Cir.3/2/05), 895 So.2d 753; State v. O'Neal, supra. The plain view doctrine renders a warrantless search reasonable: (1) if the police officer is lawfully in the place from which he views the object; (2) where the object's incriminating character is immediately apparent; and (3) the officer has a lawful right of access to the object. Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); State v. O'Neal, supra.

The entire record, including the testimony at trial, is reviewable for determining the correctness of a ruling on a pretrial motion to suppress. State v. Collins, 44, 248 (La.App.2d Cir.5/27/09), 12 So.3d 1069. This court reviews the trial court's ruling on a motion to suppress under the manifest error standard in regard to factual determinations, as well as credibility and weight determinations, while applying a de novo review to findings of law. State v. Collins, supra.

This court, in State v. Wells, 593 So.2d 465, 469 (La.App.2d Cir.1/22/92), explained the automobile exception to the warrant requirement:
The "automobile emergency exception" was first mentioned in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). There it was suggested that a warrantless search of an automobile may be justified by necessity arising out of the mobility and imminent possibility of disappearance of the vehicle. Two prerequisites were initially mentioned: probable cause to believe that the vehicle contained contraband or evidence of a crime, and exigent circumstances requiring an immediate search. California v. Carney, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), observed that the capacity to be "quickly moved" was clearly the basis of the holding in Carroll and its progeny which consistently spoke in terms of ready mobility of the motor vehicle. See Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).
We emphasize the court's further explanation in Carney, supra:

When a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes-temporary or otherwise-the two justifications for the vehicle exception come into play. First, the vehicle is obviously readily mobile by the turn of an ignition key, if not actually moving. Second, there is a reduced expectation of privacy stemming from its use as a licensed motor vehicle subject to a range of police regulation inapplicable to a fixed dwelling. At least in these circumstances, the overriding societal interests in effective law enforcement justify an immediate search before the vehicle and its occupants become unavailable. 105 S.Ct. at 2070.
In the instant case, the defendant asserts assignments of error regarding the rulings on the motions to quash and suppress. However, the defendant was not convicted of possession of controlled dangerous *549 substances, which is the main issue in both the motion to quash and the motion to suppress. The motions seek to have any evidence obtained from the black bag excluded from evidence. The fact that drugs were found is not relevant because the defendant neither pled guilty to, nor was he convicted of, any charges relating to the drugs. Therefore, this would not affect the defendant's ultimate guilty plea to the crime of attempted first degree murder. Nevertheless, part of the plea agreement provided that the defendant maintained his right to challenge the rulings so we will discuss these assignments of error in this opinion.
In denying both motions, the trial court found that probable cause existed to detain both the black bag and the defendant. Although the black bag was seized without a search warrant, the facts in this case present an exception to the warrant requirement.
If a car is "readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more." State v. Lopez, 772 So.2d 90 (La.10/30/00), citing, Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 2487, 135 L.Ed.2d 1031 (1996). A warrantless search of a vehicle is not unreasonable if there is probable cause to justify the search, without proving any additional exigency, when the vehicle is readily mobile because there is an inherent risk of losing evidence.
In the instant case, the defendant was in his car with the engine running. The fact that the car was running is a clear indication that the car was mobile. During the course of Corporal Lambert's investigation of a traffic accident involving a possible DUI charge, he received information from at least two individuals who knew that the defendant had removed a black bag from the car with the impaired driver. The individuals were not anonymous tipsters but eyewitnesses. Additionally, they both testified at the hearing on the motions. Corporal Lambert reasonably believed, and had probable cause to believe, that the black bag was possible evidence of the DUI crime and that its removal constituted obstruction of justice. Corporal Lambert only approached the vehicle after being signaled to do so by the defendant.
Probable cause to arrest exists when an officer has within his knowledge, reasonable and trustworthy information regarding facts and circumstances such that a reasonable man would believe the offender has committed or is committing a crime. State v. Thomas, 349 So.2d 270 (La.1977), citing Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). State v. Wells, supra.
In the present case, all of the circumstances, combined with the presence of the bag on the defendant's passenger seat, created probable cause that this bag could be evidence of a crime. When Corporal Lambert reached for the black bag, which was clearly visible in the defendant's convertible that had the top down, the officer had probable cause to believe that the defendant had committed the crime of obstruction of justice by removing the bag from Ms. Ettredge's vehicle.
As a reviewing court, we are reminded that the issue is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. In this case, the trial court made determinations of credibility of witnesses and determined that probable cause existed to seize the bag and to arrest the defendant. The record reveals, and the jurisprudence supports the finding, that there existed probable cause and exigent circumstances to uphold the warrantless *550 search. Thus, the search and subsequent seizure were legal, and the motions to suppress and quash were properly denied. This assignment is therefore without merit.

Guilty Plea
In the second assignment of error, the defendant argues that the district court erred by accepting the guilty plea. More specifically, he argues that the trial court should have been put on notice that there was a need for an Alford inquiry to determine whether there was a significant factual basis for the plea of the defendant. The defendant further alleges that had the trial court conducted the Alford inquiry, it would have revealed that the state's case did not contain significant evidence of actual guilt.
La. R.S. 14:30(A)(2) defines "first degree murder" as the killing of a human being:
When the offender has a specific intent to kill or to inflict great bodily harm upon a fireman, peace officer, or civilian employee of the Louisiana State Police Crime Laboratory or any other forensic laboratory engaged in the performance of his lawful duties, or when the specific intent to kill or to inflict great bodily harm is directly related to the victim's status as a fireman, peace officer, or civilian employee.
La. R.S. 14:27(A) provides in pertinent part:
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
The entry of a guilty plea must be a free and voluntary choice. For a plea to be considered free and voluntary, the transcript must establish that defendant was informed of and waived his rights to trial by jury, to confront his accusers, and of his privilege against self-incrimination. Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); State v. Nuccio, 454 So.2d 93 (La.1984).
When a guilty plea is otherwise voluntary, there is no necessity to ascertain a factual basis for that plea unless the accused protests his innocence or for some other reasons the trial court is put on notice that there is a need for such an inquiry. In that event, due process requires a judicial finding of a significant factual basis for the defendant's plea. North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); State v. Wills, 32-073 (La.App.2d Cir.6/16/99), 740 So.2d 741.
At the outset of the hearing, the trial judge clarified the exact plea agreement between the state, defense counsel and the defendant. The agreement was made subject only to the rights reserved pursuant to State v. Crosby, supra. The defendant admitted that he considered the offer only in terms of length of sentence, but was unaware as to what charge he would plead. When the charge was announced, the defendant explained that he was uncomfortable with the charge, but acknowledged that he considered the facts presented at the hearing on the motions and the odds against him and that he believed it to be in his best interest to enter the plea of guilty to the charge of attempted first degree murder.
The trial judge then identified the possible sentencing exposure under the statutes. The defendant stated that he understood the charge and that he was pleading guilty to said charge. The judge, defense counsel, the state, and the defendant all agreed that the factual basis for the plea is *551 that which was set forth during the hearing on the motions to suppress and quash. The defendant agreed that this plea was in his best interest.
The defendant stated that the decision to plead guilty was his decision and not the result of any threats or coercion. The judge asked the defendant what was his plea to the charge of attempted first degree murder to which the defendant responded, guilty.
The defendant, during his plea, did not maintain his innocence of the crime; thus Alford was not triggered. The defendant argues that declaring that his plea was a "best interest plea," transforms it into an Alford plea. However, such an argument is meritless as the defendant did not maintain his innocence during the plea. The defendant evidenced an intent to kill or inflict great bodily harm on Corporal Lambert during the high speed chase. The facts clearly establish the requisites for attempted first degree murder. This assignment is therefore without merit.

Effective Assistance of Counsel
The defendant asserts in his third assignment of error that he was denied his Sixth Amendment right to effective assistance of counsel at the hearing for the motions to quash and suppress. More specifically, he alleges that counsel failed to object to the use of statements by unidentified and unsubstantiated witnesses at the hearing for the motions to suppress and quash. These statements, according to the defendant, resulted in prejudice.
In alleging ineffective assistance of counsel, a defendant must satisfy a two-pronged test by showing, first, his attorney's performance to be so deficient as to deny him the "counsel" guaranteed by the Sixth Amendment, and second, that those errors are so serious as to deprive the accused of a fair proceeding, i.e., one with a reliable result. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Washington, 491 So.2d 1337, 1339 (La.1986). In order to prevail under the Strickland test, the defendant must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. State v. Gipson, 28,113 (La.App.2d Cir.6/26/96), 677 So.2d 544, writ denied, 96-2303 (La. 1/31/97), 687 So.2d 402.
To establish that his attorney was ineffective, the defendant first must show that counsel's performance was deficient. The assessment of an attorney's performance requires his conduct to be evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions and trial strategy, strongly presuming he has exercised reasonable professional judgment. State v. Roland, 36,786 (La.App.2d Cir.6/5/03), 850 So.2d 738.
Second, the defendant must show that counsel's deficient performance prejudiced his defense. This element requires showing the errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Strickland, supra. The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. Strickland, supra; State v. Roland, supra; State v. Pratt, 26,862 (La.App.2d Cir.4/5/95), 653 So.2d 174, writ denied, 95-1398 (La.11/3/95), 662 So.2d 9.
Although a claim of ineffective assistance of counsel is more properly raised in *552 an application for post-conviction relief rather than on appeal, this court may resolve the issue on direct appeal if the record is sufficient. La. C. Cr. P. art. 930; State v. Willars, 27,394 (La.App.2d Cir.9/27/95), 661 So.2d 673. In the instant case, the record is sufficient to review the defendant's claims of ineffective assistance of counsel.
The defendant claims that counsel was ineffective for allowing the trial judge to make factual determinations which were clearly wrong. Specifically, the defendant alleges that he was prejudiced when counsel failed to object to certain "hearsay" testimony, namely Corporal Lambert's testimony that unnamed eyewitnesses told him they saw the defendant remove the bag from Ettredge's car, and Neilsen's testimony. The defendant also alleges that counsel failed to point out Mr. Galyean's inconsistent statements and declined to make oral closing arguments on the hearing on the motions.
The complained of testimony was not "hearsay," but eyewitness testimony. The testimony given by Corporal Lambert, that other bystanders advised that the defendant had removed the bag, was not hearsay as it was not offered to prove the truth of the matter asserted but rather to explain the actions taken by Corporal Lambert.
In reality, the defendant is complaining of the trial judge's factual determination and not of any errors on the part of trial counsel. Essentially, the defendant disagreed with the testimony because it tended to prove his guilt. However, that is not a basis for a cognizable objection. Any objection to such testimony by the defendant's then counsel would not have been sustained. Therefore, under Strickland, trial counsel's performance cannot be considered to be below an objective standard of reasonableness.
Galyean was cross-examined extensively by defense counsel. After reviewing the record, we can see a clear indication that the defendant's counsel adequately cross-examined the witnesses. The defendant's main issue is that the trier of fact believed the witnesses' version instead of the defense's version of facts. The defendant has failed to establish that the result of the rulings on the motions would have been different had defense counsel not waived oral closing arguments. That is not a cognizable claim for ineffective assistance of counsel.
The defendant has failed to demonstrate that, but for defense counsel's alleged unprofessional errors, there is a reasonable probability that the result of the proceedings would have been different. He has thus failed to meet his burden of proving that he received ineffective assistance of counsel. State v. Holden, 45,038 (La. App. 2 Cir. 1/27/10), 30 So.3d 1053. This assignment is therefore without merit.

Galyean's Handwritten Statement
In the final assignment of error, the defendant alleges that he was denied his constitutional right to a complete appellate review because Russell Galyean's handwritten statement was not provided to the defendant or this court.
The record reveals that the statement was verified by Mr. Galyean, the person who wrote it, and by Officer Sadler, the officer who signed it, and that it was properly introduced into evidence. Additionally, it is part of the record as an exhibit. The fact that the defendant never saw an actual copy of it is of no matter, because it was made a part of the record and his counsel had access to the document. Moreover, the handwritten statement is a part of the record before this court. Therefore, this assignment is without merit.

*553 CONCLUSION
For the foregoing reasons, we affirm the defendant's conviction and sentence.
AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, STEWART, CARAWAY, PEATROSS and DREW, JJ.
Rehearing denied.